## JOHN F. MATHER AND ANOTHER vs. ALBERT CHAPMAN.

The right of a proprietor bounding upon the sea terminates at ordinary high water mark, with certain privileges in the adjoining shore and waters. 1. That of access to the deep sea. 2. That of wharfing out, doing no injury thereby to free navigation. 3. The right by accretion to whatever lands are by natural or artificial means reclaimed from the sea.

He has also the right to sea-weed cast by extraordinary floods above ordinary high-water mark. As owner of the soil he is constructively the first occupant of it.

But sea-weed cast and left upon the shore, that is, between ordinary high and low water mark, belongs to the public, and may lawfully be appropriated by the first occupant.

A deed of land bounding on the sea reserved the privilege "of piling up sea-weed on the shore." Held that the word "shore" was here used in its popular and not in its strictly legal sense, and that the right was reserved to pile sea-weed upon the adjoining upland.

TRESPASS for taking and carrying away a quantity of sea-weed claimed to belong to the plaintiffs, with a count in trover; brought to the Court of Common Pleas of New London County, and tried to the jury, on the general issue, before *Willey, J.*

The plaintiffs claimed to recover for the taking and removing by the defendant of several loads of sea-weed, which had been thrown by the action of the sea, after a storm, upon the

shore of Jupiter Point, in the town of Groton, below high water mark; and also for the act of the defendant in removing and casting upon the shore sea-weed which had been collected by the plaintiffs, and piled upon the defendant's upland near to the shore.

The plaintiffs claimed title to the sea-weed and the right to pile the sea-weed upon the upland by virtue of certain reservations in a deed of John J. Avery to his son Albert L. Avery, dated January 7th, 1847, and by a conveyance from John J. Avery to his son Erastus Avery, by deed dated March 13th, 1847. John J. Avery was, prior to 1847, the owner in fee of a large tract of land, lying contiguous to the waters of Fisher's Island Sound, in the town of Groton, and by the former deed conveyed to his son Albert what was known as the south farm, and by the latter deed he conveyed to his son Erastus the north farm. The plaintiffs derive their title from Erastus Avery and those claiming title under him. The defendant derives his title from Albert L. Avery, by deed dated April 27, 1864.

The deed from John J. Avery to Albert L. Avery conveyed a farm of about three hundred acres, the south line of which was described as "running westerly by and with the salt water about two hundred and twenty-five rods to John Spicer's land and wall on the south, thence still westerly by and with said Spicer's land and wall about fifty rods to the salt water again, thence westerly by the salt water to Latham's Chair Point, thence northerly, &c."; and contained the following reservation:—"Also reserving the right to get all the rock-weed from Latham's Chair Point eastward to the clump of rocks about midway of the sand beach, including said clump of rocks, and all the sea manure privilege of the shore east of the mow lots north of Pine Island and the sea-weed that may come on the shore, three-quarters of the distance from the east end of the rocky shore next east of said Latham's Chair Point, eastward to a high sharp rock marked with the letter *B* standing near the water's edge at the east end of Sandy Beach; with the privilege of piling up said sea-manure on the shore and then re-carting to the north

farm, now owned by me; for the use of my son, Erastus Avery, or whoever may improve my said north farm; and to cart the same either up the road through the head pasture or on the path leading northerly from Jupiter Point, doing as little injury to the improvement as possible."

The deed from John J. Avery to Erastus Avery conveyed another tract of land, adjoining that conveyed to Albert L. Avery on the north and known as the north farm, and with it the right reserved in the former deed with regard to sea-weed; the conveyance of this right being in the following terms —"Also I hereby convey to said Erastus the manure privileges reserved 'in a deed from me to Albert L. Avery, said privileges consisting in the right to all the rock-weed on the shore from Latham's Chair, on eastern point, easterly to a sharp rock at the east end of Elihu's Beach, being at the west end of a clump of rocks, together with the drift manure on the west part of said beach, three-fourths of the length thereof, and likewise all the rock-weed and drift manure from the shore commencing on the east side of the Jonathan Latham lot to the land of John Baker, together with the right of way to and from said shores to collect and to remove said manure in a proper manner on the regular cart ways or such as may hereafter be opened, except the cart way from the Jupiter field bars now running across the lot reserved to me to the south of John Baker's land, which way is to be turned so as to run from said bar-way to the south and west of said reserved lot where the ground is best adapted for a cart way."

The deed of Albert L. Avery to the defendant, under which the latter claimed, conveyed to him a part of the land embraced in the deed of John J. Avery to the former, the land thus conveyed bounding upon the sea shore from a certain mark placed on the beach to the end of Jupiter Point; and contained the following clause with regard to the sea-weed privilege of the former deed —" excepting and reserving all the sea-manure privilege on the shore of the land hereby conveyed; said manure-privilege having been heretofore sold and conveyed to other parties, the holders of which privilege, their heirs and assigns, are to have the right of way to the

shores for the purpose of removing such manure in accordance with the previous grants."

On the trial the plaintiffs claimed, and offered evidence to prove, that they were owners and cultivators of a part of the Avery north farm, and that the sea-weed taken by the defendant was taken at two different times and from two different places, and cast of the mow lots on Jupiter Point, once from the upland at a short distance above high-water mark, where the plaintiffs had piled it the fall before, and once from the shore where it had been cast by the action of the waves, near to but below high-water mark. They also claimed, and offered evidence to show, that John J. Avery, in the year 1847, and for a long time prior to that date, had been in the exclusive ownership and possession of the tract of land known as his north and south farm, including the lands of Jupiter Point, down to high-water mark, with all the privileges and appurtenances of a riparian proprietor; and that, down to that date, he had been in the habit of gathering sea-weed which came upon Jupiter Point, east of the mow lots, and of piling the same upon the land above high-water mark, letting the same remain there for a time, and then taking it away as convenience might require, to spread upon the farm, and also of gathering sea-weed as it was cast upon the shore, and carting it immediately away.

The counsel for the plaintiffs requested the court to charge the jury as follows:

"That John J. Avery might in his deed to Albert L. Avery make any reservation to himself or other parties which he saw fit to do; such reservation being made in terms sufficiently definite to clearly indicate the rights reserved; and that if the jury should find from the evidence that the plaintiffs were cultivators of any portion of the north farm at the time of the alleged trespass, they were entitled to the benefit of the privileges reserved in the deed to Albert L. Avery, (those priviliges being conveyed to Erastus Avery, under whom they claim,) unless there is some provision in some of the deeds clearly excluding them.

"That if the jury should find that the plaintiffs and their

grantors have been in the exercise of the rights claimed under their deeds from 1847, the date of the deed to Albert L. Avery, to the time of the trespass complained of, then, if there be any ambiguity in the terms of the grant from John J. Avery to Albert L. Avery, the contemporaneous construction thus given to the deed by the parties claiming title under it, without objection or question, on the part of the grantor or of Albert L. Avery, for that length of time, or even for fifteen years subsequent to the date of the deed, would be binding on the parties, and render perfect that title in accordance with such user, and free it from further question.

"That the right to sea-weed cast upon the shore is originally in the riparian proprietor, like the right of wharfage, and of fishery by the drawing of nets upon the shore, and not in the public; and although title to sea-weed while growing is in no one, yet that when cast upon the shore it becomes immediately the property of the riparian proprietor, and his title thereto is complete, and he in the constructive possession thereof. That if any parties claim title to sea-weed, as against the owner or riparian proprietor, the burden of proof is on them and they must show their right, and that this can only be shown by deed or prescription; that a right by prescription is a personal right, and that one individual cannot gain such right by prescription for another or for the public. That a right in the public to gather sea-weed from a beach, cannot be created or established by individual acts of trespass. And that when title to land upon a shore is once in an individual, it takes with it the rights of wharfage, fishing and of sea-weed, and an act of the legislature is necessary to render it public property and appropriate it to public use."

The court charged the jury as follows:

"That John J. Avery, being the owner of the lands, might in his deed thereof make any reservation, to himself or other parties not strangers, which he saw fit to do, of any right or interest which he had in the lands; such reservation being made in terms sufficiently definite to clearly indicate the rights reserved. Whatever right or title John J. Avery had, as proprietor of land adjoining the sea shore, to sea-weed

cast upon the shore, he by the reservation in his deed to Albert L. Avery, and by his deed to Erastus Avery, conveyed the same to Erastus Avery, and Erastus Avery could convey the same to the plaintiffs, they being cultivators of the nort! farm.

"If there was an ambiguity in the terms of the grant from John J. Avery to Erastus Avery, evidence of occupation and user might be resorted to as contemporaneous construction to show the subject matter of the grant and what right or estate was intended to be conveyed; but in the present case there is no such ambiguity; the right reserved and conveyed by the deeds was the right to gather and pile sea-weed upon the shore. The term *shore*, as applied to the sea or an arm of it, has in law a particular meaning, and means that space of ground between ordinary high and low water mark. The title to the soil of proprietors of land bordering upon the sea or upon navigable rivers extends to high-water mark, and their title to the soil ends where the shore begins.

"The title to the soil upon the *shore*, (that is, between ordinary high and low water mark,) is in the state, in trust for the public, and the public may go upon the shore, dig shell-fish, draw seines, or gather sea-weed, without license or accountability to the owner of the adjoining upland. But sea-weed thrown up by the waves, if found at or above high-water mark on the lands of the adjoining proprietor, belongs to such adjoining proprietor; but if cast and left upon the *shore* it belongs to the public, and may be lawfully appropriated by the first occupant who gathers and removes it within twenty-four hours.

"The plaintiffs claim to recover for two acts of trespass, one for throwing off from the defendant's upland upon the shore, a small heap of sea-weed or sea-manure about the 1st of July, 1870, which had been gathered and laid there in September, 1869. As the plaintiffs are limited by their deeds to piling sea-weed upon the shore, they had no right, *by virtue of their deeds or the reservations therein*, to pile it upon the upland, and if the same became and was a nuisance to the

defendant, destroying his grass, as he claims, he had a right to remove the same and cast it upon the shore.

" As to the other charge, if the sea-weed was gathered on the shore, that is between ordinary high and low water mark, the defendant, as one of the public, had the right to take it."

The jury returned a verdict for the defendant, and the plaintiffs moved for a new trial for error in the charge of the court.

*Lippitt* and *Halsey*, in support of the motion.

We contend that the charge is erroneous in three particulars :—*First*: In the construction given to the reservation. *Second*: In excluding the evidence of occupation and user. *Third*: In ruling that the sea-weed cast by the sea upon the shore was the property of the first occupant who removes it in twenty-four hours.

1. The reservation should be construed in the same way as a grant by the owner of the soil of a similar right or privilege. *French* v. *Carhart*, 1 Comst., 96. The same rule prevails in the construction of other instruments. Thus, an exception in a policy of insurance is to be construed in the same manner as a policy insuring against the excepted risk. *Ionides* v. *Universal Marine Ins. Co.*, 14 Com. Bench, N. S., 259. In the construction of deeds and other instruments the intention of the parties is to govern, and when the language used is susceptible of more than one interpretation courts will look at the surrounding circumstances existing when the contract is entered into, such as the situation of the parties and of the subject matter. *French* v. *Carhart*, 1 Comst., 102 ; *Griswold* v. *Allen*, 22 Conn., 98. Taking into view the situation of the parties, the subject matter, and the purpose of the reservation, it is obvious that the parties did not intend to limit the reservation to the " shore" technically.

2. The undisturbed use of the right on the one side, and the acquiescence on the other, are admissible, and justly entitled to weight in the construction of the reservation. *French* v. *Carhart*, 1 Comst., 102, and cases there cited.

3. Sea-weed, when cast upon a shore where the adjacent upland is private property, belongs to the riparian proprietor.

It becomes and is to be treated in law as part and parcel of the soil. This was judicially declared by the Supreme Court of New York in *Emans* v. *Turnbull*, 2 Johns., 313. In *Chapman* v. *Kimball*, 9 Conn., 42, DAGGETT, J., says the opinion in that case is "very able" and "entitled to much respect." In *Phillips* v. *Rhodes*, 7 Met., 323, HUBBARD, J., says: "The sea weed which is thrown up belongs to the owner of the beach;" citing *Emans* v. *Turnbull* for authority. BIGELOW, C. J., in *Anthony* v. *Gifford*, 2 Allen, 549, says: "By a liberal construction of the *jus alluvionis*, it is held that sea-weed, kelp, and other marine plants, when detached from the bottom of the sea and thrown on the shore or beach, become vested in the owner of the soil;" citing, among other cases, *Emans* v. *Turnbull*. BELLOWS, J., in *Clement* v. *Burns*, 43 N. Hamp., 620, says: "In *Emans* v. *Turnbull* it was held that sea-weed cast upon the shore was such a marine increase as belonged to the riparian owner, and he might justify a resistance to its removal." In *Hill* v. *Lord*, 48 Maine, 100, it was held that the right to take sea-weed from the shore is not an easement, but is a right to take a profit in the soil. *Emans* v. *Turnbull* is cited in that case with approval. In *Church* v. *Meeker*, 34 Conn., 433, BUTLER, C. J., cites the case of *Emans* v. *Turnbull*, and adverting to the fact that the decision had been approved in Massachusetts and elsewhere, and there being none the other way, says: "We are disposed to follow it also, for the sake of uniformity and certainty in respect to a matter of growing importance." It is true the case did not call for a decision of the question, for the plain, tiff was not a riparian proprietor, but as the Chief Justice spoke for the whole court, it is presumed that the opinion upon the point expressed the views of the court. Angell in his valuable work on Tide Waters, page 259, lays down the same rule, and cites *Emans* v. *Turnbull* with approval. The authorities are all on one side.

4. While by the common law, which prevails in this state the riparian proprietor upon an arm of the sea owns only to high-water mark, and all below that is in the public for purposes of navigation and commerce, yet he has certain im-

portant rights in the shore as incident to his riparian owner-
ship.   He has the exclusive right to wharf out in front of
his land.   *East Haven* v. *Hemingway*, 7 Conn., 186 ; *Chap-
man* v. *Kimball*, 9 id., 42 ; *Simons* v. *French*, 25 id., 346.
Ejectment will lie for an entry upon it and ouster of the
riparian owner.   *Nichols* v. *Lewis*, 15 Conn., 137.   So he
may maintain trespass *quare clausum fregit* for an entry upon
the shore, unconnected with the right of navigation or fish-
ing, and removing therefrom manure mixed with the soil.
*Clement* v. *Burns*, 43 N. Hamp., 609.   He has the right to
the water as appurtenant to the upland, and he cannot be cut
off from it against his consent by any extraneous addition to
his upland.   Angell on Tide Waters, 71, and cases cited.   In
*Blundell* v. *Catterall*, 5 Barn. & Ald., 298, it was held that
trespass lay for occupying the shore with machines for bath-
ing.   In *Bagott* v. *Orr*, 2 Bos. & Pul., 472, an action of
trespass for entry upon the shore adjoining the plaintiff's land,
and carrying away therefrom shell-fish and shells which had
been thrown up and left there by the tide, and justification
pleaded of common right to take them, the court held the
plea good as to the fish, but paused as to the shells, and
allowed the defendant to amend his plea by striking out his
claim in regard to the shells, which offer was accepted ; leav-
ing that part of the trespass unjustified.   Best, Sergeant, in
his argument says : " It is well known that in many parts of
England much of the various matter which is deposited upon
the shore by the sea belongs to the owners of the adjacent
soil, and is disposed of by them to very great advantage."

5.   The court erred in supposing this to be a " public beach."
A public beach is one adjoining a public highway or ground.
*Church* v. *Meeker*, 34 Conn., 433.

6.   The defendant is estopped from disputing the plaintiff's
right to the sea-weed cast upon the shore.   He holds his title
expressly subject to the reservation of the sea-manure privi-
lege of the shore.   Whatever rights John J. Avery had as
riparian owner he reserved.   If his rights were only such as
are common to the public, they would be more valuable to him
than to others, as he alone had access to the shore, except by

water. If the defendant may now take the weed, the only right under the reservation will be a right of way to the shore to get such weed as the defendant may see fit to leave, and, as he is nearest to the shore, the right will be valueless. By accepting the deed he assented to the reservation, and became bound to observe it. *Randall* v. *Latham*, 36 Conn., 48.

*Brandegee* and *Waller*, contra.

1. The rule is well settled, that parol testimony is never allowed to contradict, alter or explain a written contract, unless in case of a latent ambiguity. There was no such ambiguity in the deed of John J. Avery, reserving to himself " the sea-manure privilege of the shore." Where the language of an instrument has received a settled legal construction, parol evidence is not admissible to contradict that construction. 1 Greenl. Ev., § 277. The word " shore " has received a settled legal construction. It is that space of ground which is between high and low water mark. Hale, De Jure Maris, chap. 6 ; 2 Hilliard R. Prop., 351 ; 3 Kent Com., 427 ; 2 Washb. R. Prop., 634 ; *East Haven* v. *Hemingway*, 7 Conn., 186 ; *Church* v. *Meeker*, 34 id., 424 ; *Storer* v. *Freeman*, 6 Mass., 435 ; *Waterman* v. *Johnson*, 13 Pick., 264.

2. The title to sea-weed, cast upon the shore, that is, between ordinary high and low-water mark, has never been decided in Connecticut. It was involved in the decision of *Chapman* v. *Kimball*, 9 Conn., 38, and again in that of *Church* v. *Meeker*, 34 id., 433. But an examination of these cases will clearly show that the court in each case deliberately abstained from passing upon this question ; restricting the opinion in the former case with the greatest care to sea-weed below low-water mark, and in the latter to sea-weed above high-water mark. The question at bar is then an open one. It is to be settled upon principle, in view of the analogies of the common law, and with special reference to the uniform current of Connecticut decisions, as to the respective rights of the public and riparian proprietors, in other respects, on the shores of the sea.

3. Sea-weed in a state of nature, fast or floating, is the

property of no one. It has never been subjected to the law of " prime occupancy," which is the ultimate foundation of all title. It has grown upon no man's land. It has received no man's culture. It has been reduced to no man's possession. Like wreck; or treasure trove, or animals *feræ naturæ*, its title vests in the first occupant. 2 Bla. Com., 401; *Haslem* v. *Lockwood*, 37 Conn., 500.

4. The plaintiffs' claim to occupancy in this case rests solely upon their ownership of the adjoining upland. The case finds that the sea-weed was neither upon their land, nor in their actual possession. Their claim is therefore based upon a constructive occupancy of the weed, arising out of a constructive possession of the land upon which the weed was cast.

5. This brings us to a consideration of what rights a riparian proprietor has in the shore adjacent to his upland, according to the principles of Connecticut law and the Connecticut authorities. And we maintain, contrary to the policy which has been adopted in other states, and noticeably in Massachusetts, Maine, and New Hampshire, from which the other side draw their authorities, that the uniform doctrine of this court has been, " that the title to soil of a riparian proprietor extends only to high-water mark, and that the right of the public begins where the right of the proprietor ends." *East Haven* v. *Hemingway*, 7 Conn., 202; *Middletown* v. *Sage*, 8 id., 227; *Chapman* v. *Kimball*, 9 id., 40; *Church* v. *Meeker*, 34 id., 425. The only right incident to the ownership of the upland, over the shore, and below the line where his title ceases, is the right of reclamation and wharfage. This right, privilege, or easement, originally a *Purpresture*, or encroachment upon the royal prerogative, tolerated at first for the benefit of commerce and for the encouragement of navigation, has now come to be regarded as attached to the ownership of the upland. It is protected by the courts, and, when exercised, ripens into a title, which is treated as real estate. *East Haven* v. *Hemingway*, 7 Conn., 202; *Chapman* v. *Kimball*, 9 id., 41; *Nichols* v. *Lewis*, 15 id., 138; *Frink* v. *Lawrence*, 20 id., 117; *Simons* v. *French*, 25 id., 352. But this right, founded upon the interests of navigation, ceases with the rea-

sons upon which alone it was justified, and has never been extended to the needs of agriculture. It is an encroachment or nuisance, in derogation of public rights, tolerated only because superior public interests were promoted by it. Nor was title to or interest in the soil of the shore ever passed by this doctrine, until the right was exercised by actual reclamation. Until then, all rights of the public were superior, that is, of passage, of fishery, of navigation, of bathing, of taking shell fish, &c. The right of fishery below high-water mark is conceded to be in the public. So the right to dig up the soil for shell fish has been in this state decided to be " *publici juris.*" *Peck* v. *Lockwood*, 5 Day, 22. Why not, upon the same principle, the right to collect sea-weed which has not mixed with the soil, and is a waif until reduced to possession ?

6. The cases relied on by the plaintiffs will each upon examination be found to affirm the doctrine " that sea-weed cast upon soil belonging to a riparian proprietor vests in such proprietor because of the ownership of the soil. In *Church* v. *Meeker*, 34 Conn., 428, the reasoning of BUTLER, C. J., proceeds upon that assumption. In *Emans* v. *Turnbull*, 2 Johns., 314, the case shows that the title to the soil upon which weed was cast was in the defendant. In *Phillips* v. *Rhodes*, 7 Met., 322, the fee was in the plaintiff, by the ordinance of 1641, by which the state of Massachusetts adopted the policy of extending the fee of all riparian proprietors one hundred feet from high-water mark. In *Hill* v. *Lord*, 48 Maine, 98, the only question decided was that the right to take sea-weed was not an easement, but a *profit a prendre*. In *Clement* v. *Burns*, 43 N. Hamp., 621, the court find the law of Massachusetts, (ordinance of 1641,) applicable to New Hampshire, and consequently that the fee of the *locus in quo* was in the plaintiff. In the two English cases, *Bagott* v. *Orr*, 2 Bos. & Pul., 472, and *Blundell* v. *Catterall*, 5 Barn. & Ald., 258, it is specially found in the statement that the fee of the *locus in quo* was in the lord of the manor, by grant from the king. No case can be found where, the fee of the soil being in the public, title to abandoned property cast upon such soil vests in the adjacent riparian proprietor. And it is believed that no good reason

can be given why title to personal property, which upon all the principles of the common law vests in the public, should be vested in an individual, solely because he has been permitted successfully to encroach upon other public rights, and to defend against an indictment on the ground that he has not created a nuisance.

7. As there is no principle of law, so there is no consideration of equity, that sustains the plaintiffs' claim. The riparian owner already has, by the rule adopted in *Church* v. *Meeker*, the exclusive title to all the marine manure cast at or above ordinary high-water mark. This embraces nearly the whole product of the sea, because it is usually cast up in storms or violent winds, which carry and deposit it above the ordinary range of the tide. He has also, by the advantage of his position, the opportunity to throw the sea-weed, immediately upon its deposit, above the shore line, and thus appropriate it by occupation. To hold that title to all weed, both upon shore and upland, absolutely vests in him, is to give him the monopoly of this valuable marine increment, and to reduce the vaunted rights of the public upon the shores of the " great highway of the world " to a sham and a myth.

SEYMOUR, C. J.  The first count of the plaintiffs' declaration is in trespass for the taking and converting to his own use by the defendant of large quantities of sea-weed alleged to be the proper goods and estate of the plaintiffs. This sea-weed was cast upon the shore adjoining the defendant's land, and was there, below high-water mark, taken by the defendant and converted to his own use. The Court of Common Pleas, against the request of the plaintiffs, instructed the jury, in substance, that sea-weed cast and left upon the shore, (that is, between ordinary high and low-water mark,) *primâ facie* belongs to the public and may lawfully be appropriated by the first occupant.

To this charge the plaintiffs object, and the principal question in the case arises upon this objection.

A different question arises under the second count, which will be considered in its proper place.

It is conceded that by the settled law of Connecticut the title of a riparian proprietor terminates at ordinary high-water mark. It is also conceded that though his title in fee thus terminates, yet he has certain privileges in the adjoining waters.

Among the most important of these privileges are—(1.) That of access to the deep sea. (2.) The right to extend his lands into the water by means of wharves, subject to the qualification that he thereby does no injury to the free navigation of the water by the public. (3.) The right by accretion to whatever lands by natural or artificial means are reclaimed from the sea, subject however to certain qualifications not necessary here to be mentioned.

The plaintiffs claim that among the privileges of the riparian proprietor is also that of the exclusive right to the seaweed which is cast upon the shore and left there by the receding tide.

In respect to the weed cast by extraordinary floods upon the land of the proprietor and there left above ordinary high-water mark, the law of this state is settled, in conformity with what we understand to be the common law of England. The owner of the soil has it *ratione soli.* No other person can then take it without a trespass upon the owner's land, and as owner of the land he is deemed to be constructively the first occupant.

But below high-water mark the soil does not belong to the owner of the upland. The sea-weed in dispute was not taken from the plaintiffs' land, and their title, if they have a title, is not *ratione soli.* No trespass on the plaintiffs' land was committed by the defendant in taking the weed, for the taking of which recovery is sought in this count*.

---

* Both the judge and the counsel in discussing the abstract question of the title to sea-weed left upon the shore, speak of the adjoining upland as the land of the plaintiffs. The plaintiffs' rights as to the sea-weed were precisely what they would have been if they had been in fact the owners of the upland, since they took whatever rights in this respect were originally owned by John J. Avery as owner of the upland ; those entire rights having been reserved in his deed of the land to Albert L. Avery, and afterwards conveyed entire to Erastus Avery, from whom they came to the plaintiffs. The plaintiffs therefore stood

Upon what ground then can the plaintiffs sustain the title
which they claim to the weed ?    While it was floating on the
tide it was *publici juris*.    Why, when it is left on the shore
by the receding tide, should it become their property ?

In Massachusetts and Maine, by virtue of the Colonial Ordi-
nance of 1641, the individual title of proprietors adjoining
navigable water extends to low-water mark.    Sea-weed left
by the receding tides being then on private property, the owner
of the soil has title *ratione soli*, not only to sea-weed but to
other articles cast upon and left on the shore.    Thus in *Bar-
ker* v. *Bates*, 13 Pick., 255, a stick of timber was thrown up
and had lodged on the shore within the old colony of Plym-
outh.    The question is largely discussed by SHAW, Ch. J.,
whether the ordinance of 1641 extends to the colony of
Plymouth.    That being settled, the learned judge proceeds
to say :  " Considering it as thus established that the place upon
which this timber was thrown and had lodged was the soil
and freehold of the plaintiff, the defendants cannot justify
their entry for the purpose of taking away or marking the
timber.    We are of opinion that such entry was a trespass,
and that, as between the plaintiff and defendant, the plaintiff
had in virtue of his title to the soil the preferable right of
possession, and that the plaintiff has a right to recover the
agreed value of the timber."

The cases therefore in Massachusetts and Maine which
decide that sea-weed left on the shore belongs to the riparian
proprietor have no application here.    In New Hampshire the
Massachusetts ordinance is adopted as law.

In New York the common law rule is adopted, as with us, in
relation to the boundary line between the public and the ri-
parian proprietor, and it is claimed that in *Emans* v. *Turnbull*,
2 Johns. R., 313, the question before us is decided in con-
formity with the plaintiffs' claim.    The judgment in that

only upon an easement, but their rights under that easement, so far as the shore
was concerned, were those of adjoining owners.    It would require so much cir-
cumlocution to state their position with accuracy every time there is occasion
to refer to it, that it as well to consider them, for the purposes of the discussion,
as in fact owners of the upland.                                              *R.*

case is pronounced by a judge of profound learning, whose opinion upon the point now under discussion, if really given, would be entitled ·to great weight; but we are inclined to think that the sea-weed in that case was cast upon the land of the plaintiff. The main argument at the bar and on the bench relates to the title to the locus in quo. Chief Justice KENT says :—" If the marine increase be by small and imperceptible degrees, it goes to the owner of the land. The sea-weed must be supposed to have accumulated gradually."

In the case we are called on to decide the sea-weed could not be regarded as a marine increase of the plaintiffs' land, for it had not reached their land and was not attached to it nor connected with it. To be a marine increase it must form part and parcel of the land itself. Being between high and low-water mark, at each returning tide it would be afloat, and even in Massachusetts sea-weed when afloat is *publici juris,* although floating over soil which is private property.

The sea-weed in this suit is not treated as part of the real estate which by small and imperceptible degrees had become part of the plaintiffs' land. It is treated as personal property, and the defendant is sued for taking it as such and converting it to his own use. In the case of *Emans* v. *Turnbull* the plaintiff's title was held good upon a liberal construction of the *jus alluvionis,* which implies that the weed had then become part and parcel of the plaintiff's land and must therefore have been above or upon ordinary high-water mark. Title to personal property *jure alluvionis* would be a novelty in the law.    2 Black. Com., 262.    Title by accretion is substantially the same as by alluvion.    Both are modes of acquiring title to real property.

Title however to personal property may be acquired by what in law is called accession, but to acquire title by accession the accessory thing must be united to the principal, so as to constitute part and parcel of it.    " Accessio" is defined by Bouvier as " a manner of acquiring the property in a thing which becomes *united* with that which a person already possesses."    The plaintiffs therefore seem to us to have no title by alluvion, or by accretion, or by accession, certainly none

*ratione soli*, and they cannot be regarded as first occupants by construction merely because of the *propinquity* of their land to the property in dispute.

The question under discussion does not seem to be fully settled in England. The soil of the sea-shore is there, as with us, *primâ facie* in the public, but it may become private property, and frequently is so, where the adjoining lands are part of the manor. The authority of Bracton is clearly in favor, (1st,) of the common right *of all* to the *shores* of the sea as *part of the sea itself*. (2d.) In Liber 2, speaking of the right of first occupancy, he says "Item, locum habet eadem species occupationis in iis quæ communia sunt, sicut in mare et *littore maris*, *in lappillis et geminis et ceteris in littore maris inventis*." Sea-weed must be included within the *et ceteris* of Bracton in this passage, and upon his authority belongs to the first occupant.

The opinion of Lord HALE in favor of the common right to take sea-weed on the shore is shown by the following passage in chapter 6 of Hale de Jure Maris. After speaking of three kinds of shore he says, " This kind of shore, to wit, that which is covered by the ordinary flux of the ocean, may belong to a subject, and may be parcel of a manor, and the evidences to prove it parcel of a manor are commonly these, constant and usual fetching of gravel and sea-weed and sea-sand, between high and low-water mark, and *licensing others so to do*."

In the case however of *Bagott* v. *Orr*, 2 Bos. & Pul., 472, the court expressed doubts upon the right of the public to come upon the shore and take shells which had been thrown up and left there by the tide.

In the case of *Blundell* v. *Catterall* there occurs a very learned and interesting discussion upon the right of the public between high and low-water mark, but the precise question now under our consideration is not made the subject of comment.

The case of *Church* v. *Meeker*, 34 Conn. R., 421, is relied upon by both parties. We think the opinion of Judge BUT-

LER in that case must be construed as applicable solely to sea-weed found as it there was above high-water mark.

In the case of *Peck* v. *Lockwood*, 5 Day, 22, the plaintiff owned a portion of the shore below ordinary high-water mark, and it was held that he could not maintain trespass against the defendant, who entered the premises when the tide was out and dug for shell fish and carried the fish away. That is a strong case in favor of the common right of fishing.

But the right of taking sea-weed would seem to stand on the same ground as the right of taking fish. We see no reason for making a distinction between the vegetable and animal products of the ocean. Neither in the state of nature is the property of any one; the title to both depends upon the first occupancy. It is agreed that while afloat both are alike common; why, when the tide recedes and leaves shell-fish and sea-weed on the shore, should the sea-weed belong to the riparian proprietor when confessedly the shell-fish remains common property?

We think the charge of the judge in regard to the first count was correct.

In respect to the second count a different question arises.

The plaintiffs under that count claimed to recover for the throwing off from the defendant's upland upon the shore a small heap of sea-weed which had been gathered by the plaintiffs and laid there. The plaintiffs claimed the right to pile it on the upland where it was piled, and the defendant denied the right and justified the removal of the heap as a nuisance. The conveyances upon which this question depends are as follows.

Prior to January 7th, 1847, John J. Avery was the owner of a large tract of land in the town of Groton lying contiguous to the waters of Fishers' Island Sound, divided into two farms, and bounding southerly for some distance on " salt water." On that day he conveyed to his son, Albert L. Avery, the south part of the farm, reserving " all the sea-manure privilege of the shore east of the mow lots north of Pine Island, &c., with the privilege of piling up said sea-manure on the shore, and then re-carting to the north farm; for

the use of his son Erastus Avery, or whosoever should improve his said north farm." On the 13th of March, 1847, he conveyed to his son Erastus Avery the north farm, and also " the *manure privileges* reserved in a deed from me to Albert L. Avery ; said privileges consisting in the right to all the rockweed on the shore from Latham's Chair, on Eastern Point, easterly to a sharp rock at the East end of Elihu's Beach, being at the west end of a clump of rocks, together with the drift manure on the west part of said beach, three-fourths of the length thereof ; and likewise all the rock-weed and drift-manure from the shore, commencing on the east side of the Jonathan Latham lot, to the land of .John Baker, together with the right of way to and from said shores, to collect and to remove said manure in a proper manner, &c."

The plaintiffs claimed title under the foregoing deed to Erastus Avery. The defendant's title was under a deed dated the 27th of April, 1864, from Albert L. Avery, which conveyed to the defendant a portion of the south farm, which had been conveyed to him in 1847, bounding on the shore, " excepting and reserving all the sea-manure privilege on the shore of the land hereby granted, said manure privilege having been sold and conveyed to other parties, the holders of which privilege, their heirs and assigns, are to have the right of way to the shores for the purpose of removing such ma-. nure in accordance with provisions granted."

The court charged the jury that, as the plaintiffs are limited by their deeds to piling sea-weed *"on the shore,"* they had no right by virtue of their deeds and reservations therein to pile it upon the *upland.* The defendant's argument is that the word "shore" has a definite and inflexible meaning in law, denoting the space between ordinary high and low-water mark. It is true that the word is now generally used in treatises on navigable waters in that sense, but Lord HALE says there be three kinds of shore. (Hale de Jure Maris, chap. 6.) One of these three kinds is the space between high and low-water mark. Both the other kinds embrace portions of the land above ordinary high-water mark.

Webster, in his Dictionary, defines shore thus :—" The

coast or land adjacent to the ocean, sea or a large lake or river." He says we use the word to express the land near the border of the sea or of a great lake to an indefinite extent, as when we say " a town stands on the shore." Bouvier defines shore as "land on the side of the sea or a lake or river." He gives to the compound word " sea-shore" the more limited meaning of land between high and low-water mark.

The privilege of piling the manure above high-water mark, on the margin of the land granted, is a valuable privilege and a proper subject of reservation, for it reserves a right in the thing granted, but the land below ordinary high-water mark not belonging to the grantor, the reservation of a right to pile sea-weed there would be the reservation of a right not in nor upon the land granted, but wholly outside of it. The reservation ought to be construed as reserving something which but for the reservation would have passed by the deed; but the right to pile sea-weed between high and low-water mark is a right which, as we have already seen, does not pertain to the riparian proprietor. Besides, such a right would be of small value, if indeed of any value, for each returning tide would probably scatter the pile.

In regard to this count, we think the construction given to the reservation was wrong, and therefore advise a new trial.

In this opinion the other judges concurred.