[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-16225

_____

D. C. Docket No. 07-00208 CV-1

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 28, 2010
JOHN LEY
ACTING CLERK

AQUA LOG, INC.,
a Georgia corporation,

Plaintiff-Appellee,

versus

STATE OF GEORGIA,

Claimant-Appellant.

_____

No. 08-16274

_____

D. C. Docket No. 07-00036-CV02

AQUA LOG, INC.,

Plaintiff-Appellee,

versus

STATE OF GEORGIA,

Interested Party-Appellant.

_____

Appeals from the United States District Court
for the Southern and Middle Districts of Georgia
_____

(January 28, 2010)

Before BLACK, WILSON and COX, Circuit Judges.

BLACK, Circuit Judge:

This appeal arises from two *in rem* admiralty actions filed by Appellee Aqua Log, Inc. (Aqua Log) seeking to salvage logs lying at the bottom of Georgia's rivers. Appellant the State of Georgia intervened as an interested party and alerted the courts to its claim to ownership of the logs. In each case, Georgia filed a motion to dismiss, arguing the court lacked subject matter jurisdiction because the Eleventh Amendment prohibited a federal court from adjudicating its interest in the logs. The district courts denied Georgia's motions to dismiss, holding Georgia could not claim Eleventh Amendment immunity because it lacked actual possession of the res. We affirm the district courts' orders.

## I. BACKGROUND

During the nineteenth and early twentieth centuries, commercially harvested logs were commonly rafted down Georgia's rivers and streams to coastal markets. A small percentage of such logs sank while in transit and remain submerged in Georgia's waterways. These logs, referred to as deadhead logs, were cut from old growth forests and thus have certain valuable characteristics not found in modern timber.

In 1985, Georgia passed a statutory scheme governing the use and ownership of submerged cultural resources. *See* O.C.G.A. § 12-3-80 to -83. Under these statutes, the state is given title to all submerged cultural resources and the Georgia Department of Natural Resources (DNR) is empowered to enact such rules and regulations as may be necessary to protect or recover such resources. O.C.G.A. §§ 12-3-80 to -81.

At the time Aqua Log filed its complaints, Georgia had a permit procedure in place exclusively applicable to the removal of deadhead logs. *See* O.C.G.A. § 12-3-82.1 (repealed January 1, 2008).[1] This procedure required anyone who desired to recover deadhead logs to first submit an application to the DNR with a

---

[1] After the expiration of section 12-3-82.1 on January 1, 2008, permits for the removal of deadhead logs are governed by section 12-3-82, which establishes procedures for obtaining a permit for the exploration, survey, or recovery of any submerged cultural resource.

plan detailing the location, scope, and methods of the proposed recovery. O.C.G.A. § 12-3-82.1(c). The DNR was authorized to issue a permit only after considering the operation's effect on factors such as water quality, wildlife habitat, the state's commercial and recreational fisheries, endangered species, and land use. O.C.G.A. § 12-3-82.1(e)(1).[2] The applicant was required to pay an annual fee of $10,000, post a bond of up to $50,000, and pay the DNR adequate consideration for any recovered logs. O.C.G.A. § 12-3-82.1(f)–(h). Anyone who removes a submerged cultural resource without a permit is guilty of a misdemeanor. O.C.G.A. § 12-3-83.

The Wildlife Resources Division of the DNR contracted with the United States Department of the Navy to use sonar to survey portions of the Altamaha River for the presence of deadhead logs. The survey was completed on September 20, 2000, and revealed a relatively low number of logs, many of which have likely changed position since the time of the survey due to normal river conditions.

---

[2] The DNR appointed a task force in 1998 to review the possible consequences of removing deadhead logs from Georgia's waterways. The task force concluded removing submerged timber could have an effect on game fish, mussels, endangered species, water quality, and stream morphology. The task force also noted the removal of deadhead logs could interfere with recreational boating.

Aqua Log filed two nearly identical complaints against certain specified *in rem* defendant logs lying on the bottom of the Altamaha and Flint Rivers in the Southern District and Middle District of Georgia. In each case Aqua Log requested the court to grant a salvage award for its recovery of the *in rem* defendants, or, if the owners of the logs could not be determined, title to the logs under the law of finds.

The only pertinent difference between the two cases was the manner in which the logs were seized. In the case in the Southern District, several state officers were present at the time of the seizure, which was conducted pursuant to an order from the magistrate judge granting the U.S. Marshals control of the premises.[3] In the case before the Middle District, a representative log was seized pursuant to an order from the magistrate judge without the presence of state officers soon after the complaint was filed.

Georgia filed a statement in each case for the limited purpose of alerting the court to Georgia's claim of ownership of the *in rem* defendants. The statements explicitly stated Georgia did not waive its sovereign immunity. Georgia also filed a motion to dismiss for lack of subject matter jurisdiction in each case, arguing the

---

[3] Prior to the seizure, Georgia had notified Aqua Log of its ownership of the logs and the need to obtain a permit before undertaking any actions with respect to the *in rem* defendants.

5

Eleventh Amendment barred the court from adjudicating its interest in the logs. Both district courts denied Georgia's motions, finding the Eleventh Amendment did not defeat federal jurisdiction because the state lacked actual possession of the res at issue in each case. Georgia appeals these orders in a consolidated appeal.[4]

## II. JURISDICTION

The judicial power of the federal courts extends "to all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2, cl. 1. The jurisdiction of the federal courts is limited, however, by the Eleventh Amendment, which provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. While early cases cast doubt on whether the Eleventh Amendment is applicable in this context, the Supreme Court has more recently held *in rem* admiralty actions are "not wholly exempt" from the Amendment's limitations on federal jurisdiction. *See California v. Deep Sea Research, Inc.*, 523 U.S. 491, 502–03, 118 S. Ct. 1464, 1470–71 (1998).

---

[4] While the orders appealed are interlocutory orders, they are appealable under the collateral order doctrine because they address Eleventh Amendment immunity. *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 147, 113 S. Ct. 684, 689 (1993).

6

"Although the Eleventh Amendment bars federal jurisdiction over general title disputes relating to state property interests, it does not" defeat federal jurisdiction over all *in rem* admiralty actions to which a state claims an interest. *Id.* at 506, 118 S. Ct. at 1472. As in all cases involving sovereign immunity, the state must not consent to the federal court's jurisdiction or otherwise waive its immunity. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675, 119 S. Ct. 2219, 2226 (1999). The state must also have "a colorable claim to possession" of the res. *Fla. Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697, 102 S. Ct. 3304, 3321 (1982). Finally, the state must be in possession of the res. *Deep Sea Research*, 523 U.S. at 507–08, 118 S. Ct. at 1473.

Georgia has not waived its immunity and has asserted at least a colorable claim to ownership of the res. The sole issue raised on appeal is thus whether Georgia had possession of the logs lying at the bottom of the Altamaha and Flint Rivers.[5]

---

[5] The Southern District found Georgia had raised a colorable claim to ownership of the logs and had not waived its immunity. Aqua Log did not cross appeal and has not otherwise contested the district court's conclusions. The Middle District found it unnecessary to reach these issues after finding Georgia lacked possession of the res.

## III. DISCUSSION

In *Deep Sea Research*, the Supreme Court reaffirmed the vitality of a series of cases dating back to the nineteenth century that hold a government can assert sovereign immunity in an *in rem* admiralty proceeding only when it is in possession of the res. *Deep Sea Research*, 523 U.S. at 506-07, 118 S. Ct. at 1472–73. Although these cases hold a state lacking possession cannot assert sovereign immunity, courts have yet to provide a comprehensive definition of the possession requirement. To determine if Georgia possessed the res in this case, we must therefore analyze each case and, where the law remains uncertain, look to how possession is defined in other areas of the law.

This Court's analysis begins with *The Davis*, 77 U.S. 15 (1869), a Reconstruction era case decided under the analogous sovereign immunity of the United States.[6] The Supreme Court has recently held that "[w]hile this Court's decision in *The Davis* was issued over a century ago, its fundamental premise remains valid in *in rem* admiralty actions." *Deep Sea Research*, 523 U.S. at 507,

---

[6] Although earlier cases indicated a government in possession of the res was entitled to immunity from an *in rem* admiralty action, *see The Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812) (holding France was entitled to immunity regarding an *in rem* action against a French ship of war in the possession of French officers), *The Davis* appears to be the first Supreme Court case holding a government could not claim immunity because of a lack of possession.

118 S. Ct. at 1473.[7]  In *The Davis*, the United States shipped a cargo of cotton aboard a private vessel that, after meeting with disaster at sea, was transported to a place of safety by a group of salvors.  77 U.S. at 16.  Upon the ship's arrival at port, and before the cargo was delivered, the ship's salvors filed an *in rem* action in state court requesting a lien against the vessel and its cargo for salvage services rendered in saving the property.  The United States intervened, claiming immunity based on its ownership of the cargo.  *Id.*

The Court in *The Davis* held an *in rem* action may be maintained against government property when the suit "does not require that the property shall be taken out of the possession of the United States."  *Id.* at 21.  The Court continued:

> But what shall constitute a possession which, in reference to this matter, protects the goods from the process of the court?  The possession which would do this must be an actual possession, and not that mere constructive possession which is very often implied by reason of ownership under circumstances favorable to such implication.  We are speaking now of a possession which can only be changed under process of the court by bringing the officer of the court into collision with the officer of the government, if the latter should choose to resist.  The possession of the government can only exist through some of its officers, using that phrase in the sense of

[7] In *Deep Sea Research*, the Supreme Court also explained that "[i]n considering whether the Eleventh Amendment applies where the State asserts a claim in admiralty to a res not in its possession, this Court's decisions in cases involving the sovereign immunity of the Federal Government in *in rem* admiralty actions provide guidance, for this Court has recognized a correlation between sovereign immunity principles applicable to States and the Federal Government."  523 U.S. at 506–07, 118 S. Ct. at 1472–73 (citing *Tindal v. Wesley*, 167 U.S. 204, 213, 17 S. Ct. 770, 773–74 (1897); *Treasure Salvors*, 458 U.S. at 710, 102 S. Ct. at 3327).

9

any person charged on behalf of the government with the control of the property, coupled with its actual possession.

*Id.* at 21. Applying this test, the Court ultimately found the government lacked possession because the vessel was a common carrier and the goods had not yet been delivered to an officer of the United States. *Id.* at 21–22.

The Supreme Court again interpreted the possession requirement in *Compania Espanola de Navegacion Maritima, S.A. v. The Navemar*, 303 U.S. 68, 58 S. Ct. 432 (1938). In *The Navemar*, a Spanish corporation brought an *in rem* admiralty suit against a Spanish steamship in federal court. The Spanish government claimed ownership of the vessel and challenged the court's jurisdiction on the basis of sovereign immunity. *Id.* at 70–71, 58 S. Ct. at 433. The Court stated, to claim immunity, the Spanish government would need to demonstrate "actual possession by some act of physical dominion or control." *Id.* at 75–76, 58 S. Ct. at 435. The Court ultimately held Spain's claim of ownership, which arose from a decree of attachment rather than any physical presence, could not qualify as possession for purposes of immunity. *Id.*[8]

---

[8] The Supreme Court applied the possession requirement soon after deciding *The Navemar* in a case with very similar facts. *See Republic of Mexico v. Hoffman*, 324 U.S. 30, 65 S. Ct. 530 (1945). Federal district and circuit courts have likewise held a foreign government cannot claim sovereign immunity with respect to a vessel not in its possession. *See United States v. Jardine*, 81 F.2d 745 (5th Cir. 1935); *The Carlo Poma*, 259 F. 369 (2d Cir. 1919) (rev'd on other grounds 255 U.S. 219, 41 S. Ct. 309); *The Attualita*, 238 F. 909 (4th Cir. 1916); The *Johnson Lighterage Co. No. 24*, 231 F. 365 (D.N.J. 1916); *Long v. The Tampico*, 16 F. 491

The Supreme Court's most recent discussion of the possession requirement is found in *California v. Deep Sea Research*. The plaintiff in *Deep Sea Research* brought an *in rem* admiralty action against a shipwreck found in California's waters. 523 U.S. at 495–96, 118 S. Ct. at 1467. California intervened and asserted sovereign immunity based on its claim to the vessel under state and federal statutes granting the state title to certain abandoned shipwrecks located on submerged state lands. *Id.* at 496, 118 S. Ct. at 1467. The state was not present during the plaintiff's seizure of items from the shipwreck. At the time plaintiff filed its complaint, the state was not even aware of the shipwreck's location. Transcript of Oral Argument at 27, *Deep Sea Research*, 523 U.S. 491, 119 S. Ct. 2219 (No. 96-1400), 1997 WL 751917. Relying on longstanding precedent in maritime cases, the Supreme Court held the state could not claim immunity because it lacked possession of the res. *Id.* at 507–08, 118 S. Ct. at 1473. Borrowing from *The Davis*, the Court stated, to claim immunity, a state must have "an actual possession, and not that mere constructive possession which is very often implied by reason of ownership under circumstances favorable to such implication." *Id.* at 507, 118 S. Ct. at 1473 (quoting *The Davis*, 77 U.S. at 21).[9]

(S.D.N.Y. 1883).

[9] The Sixth Circuit has applied *Deep Sea Research* in two cases involving similar *in rem* actions for abandoned shipwrecks. *See Fairport Int'l Exploration, Inc. v. The Shipwrecked*

11

After reviewing this precedent, we conclude a state must exert some element of physical control over the res to satisfy the possession requirement. All three cases discussed above hold possession requires something more than mere ownership or legal control of the res. The Court in *The Navemar* stated the government needed to demonstrate "possession by some act of physical dominion or control." 303 U.S. at 75, 58 S. Ct. at 435. In *The Davis*, the Court indicated physical possession is required by stating "possession of the government can only exist through some of its officers." 77 U.S. at 21.

The Supreme Court has also indicated physical control over the res is necessary by defining the requisite possession as actual possession. *See Deep Sea Research,* 523 U.S. at 507, 118 S. Ct. at 1473; *The Navemar,* 303 U.S. at 75, 58 S. Ct. at 435; *The Davis*, 77 U.S. at 21.[10] As Judge Wood explained in her well reasoned opinion in this case, "legal treatises from the same time period [as *The Davis*] clearly indicate that actual possession includes a purposeful and physical dimension. For example, in his 1888 treatise, 'Possession in the Common Law,'

---

*Vessel*, 177 F.3d 491, 497–98 (6th Cir. 1999); *Great Lakes Exploration Group, LLC v. Unidentified Wreck and (For Salvage-Right Purposes), Abandoned Sailing Vessel*, 552 F.3d 682, 689 (6th Cir. 2008). In each case, the Sixth Circuit held the state could not claim immunity because it did not have actual possession of the shipwreck.

[10] Circuit courts have also stated the government must demonstrate actual possession. *See Bouchard Transp. Co. v. Updegraff*, 147 F.3d 1344, 1349 (11th Cir. 1998); *Fairport Int'l Exploration, Inc. v. The Shipwrecked Vessel*, 177 F.3d 491, 498 n.3 (6th Cir. 1999).

12

British law professor Frederick Pollock notes that, while '[a]ctual possession' as opposed to 'constructive possession' is . . . an ambiguous term . . . [i]t is most commonly used to signify physical control, with or without possession in law.'" *Aqua Log, Inc. v. Lost and Abandoned Pre-Cut Logs and Rafts of Logs*, 584 F.Supp.2d 1367, 1380 (S.D. Ga. 2008) (quoting Frederick Pollock & Robert Samuel Wright, Possession in the Common Law 27 (Oxford Univ. Press 1888)).

Outside the context of *in rem* admiralty proceedings, cases contemporary to *The Davis* and *The Navemar* also hold actual possession requires some measure of physical control. The New York Court of Appeals, for example, held "[p]ossession means simply the owning or having a thing in one's own power; it may be actual, or it may be constructive. Actual possession exists where the thing is in the immediate occupancy of the party; constructive is that which exists in contemplation of law, without actual personal occupation." *Brown v. Volkening*, 64 N.Y. 76, 80 (1876); *see also, Churchill v. Onderdonk*, 59 N.Y. 134, 136 (1874) ("Actual possession . . . mean[s] a foothold on the land, an actual entry, a possession in fact, a standing upon it, an occupation of it, as a real demonstrative act done."); *Shannon v. Long*, 60 So. 273, 276 (Ala. 1912) ("Actual possession, or possession in fact, exists when the thing is in the immediate occupancy of the party . . . .") (quoting *S. Railway Co. v. Hall*, 41 So. 135, 136 (Ala. 1906)).

13

Applying this definition of actual possession, the Vermont Supreme Court explained that "logs in a stream, or piled upon the banks of a stream for the purpose of being floated down the stream, . . . . [are] of such a cumbrous character and so situated, that they . . . [are] incapable of actual, personal possession. Constructive possession is all, or nearly all, that it is practicable for the owner to have of such property." *Kingsley v. White*, 57 Vt. 565 (1885).

Modern cases likewise define actual possession as "physical possession" or "actual personal dominion." *See, e.g., United States v. Derose*, 74 F.3d 1177, 1185 (11th Cir. 1996). In modern criminal law, "[c]onstructive possession . . . occurs when one has knowledge of the thing possessed 'coupled with the ability to maintain control over it or reduce it to his physical possession, even though he does not have actual personal dominion.'" *United States v. Wynn*, 544 F.2d 786, 788 (5th Cir. 1977) (quoting *Spataro v. State*, 179 So.2d 873, 877 (Fla. App. 1965)). "Similarly, a court may find constructive possession by finding ownership, dominion, or control over the contraband itself or dominion or control over the premises or the vehicle in which the contraband was concealed." *Derose*, 74 F.3d at 1185 (citing *United States v. Martinez*, 588 F.2d 495, 498 (5th Cir. 1979)).

14

Applying this definition, Georgia's possession was, at most, mere constructive possession, which is insufficient to meet the possession requirement of the Supreme Court's *in rem* admiralty jurisprudence. Georgia performed no act of physical control with respect to the res.[11] At the time the res in each case was seized, state officers either were not present or were merely observers of a proceeding controlled by U.S. Marshals. Georgia claims possession by locating the logs using sonar, enacting a statutory scheme conferring ownership and control over the logs to the state, owning the land on which the logs are situated, and patrolling the rivers. None of these acts, however, is sufficient to establish actual possession.

Georgia's ownership of the land on which the logs are located, and any possible possession of such land by patrolling the rivers, at most merely gives rise to constructive possession of the logs. Courts contemporary to *The Davis* and *The Navemar* have held a landowner, through his actual possession and control of her land, has only constructive possession of personal property found on her land. In *Ferguson v. Ray*, for example, the Oregon Supreme Court held a landowner had superior title to a lessee who found a large quantity of gold-bearing quartz on the

_____

[11] We need not decide whether physical markings of ownership, such as nets, buoys, or signs, would have been sufficient to create actual possession because Georgia does not claim to have created any such physical indicia of ownership.

15

leased property. 77 P. 600 (Or. 1904). The court explained "the legal possession [of the personal property] rests on a real de facto possession [of the land], constituted by the occupier's general power and intent to exclude unauthorized interference." *Id.* at 603. Moreover, in dicta, the Supreme Court of Connecticut stated in *Mather v. Chapman* that when personal property is washed on a privately owned shore, the "owner of the land . . . is deemed to be *constructively* the first occupant." 40 Conn. 382 (1873) (emphasis added).

Georgia's legal control of the res is also insufficient to create possession for purposes of Eleventh Amendment immunity. As discussed above, mere legal control, without any element of physical control, can create only constructive possession. Any alternative ruling would largely collapse the distinction between actual and constructive possession. The standard case of constructive possession is that which is "implied by reason of ownership." *The Davis*, 77 U.S. at 21. The state regulations governing deadhead logs seem to control the logs in much the same way mere ownership grants an owner the right to control his property. In each case, the state and the owner have the right to use the property, can exclude others from enjoyment of the property, and can institute legal actions against those who do not respect their property rights. Just as California's claim of title to the

16

shipwreck in *Deep Sea Research* was found to be insufficient, Georgia's legal control of the res through its statutory scheme cannot create actual possession.

We therefore hold Georgia cannot assert Eleventh Amendment immunity and must submit to the district courts' jurisdiction. This Court does not address which party should ultimately prevail on the merits. We express no opinion as to whether Aqua Log may claim the logs under admiralty law.

### III. CONCLUSION

For the reasons stated above, we hold Georgia cannot assert Eleventh Amendment immunity because it lacks possession of the res in each case. We therefore affirm the district courts' orders denying Georgia's motions to dismiss for lack of subject matter jurisdiction.

**AFFIRMED**.